## Case No. 6,280.

### HAZARD v. HOWLAND.

[2 Spr. 68.] [1]

District Court, D. Massachusetts. June, 1803.

ADMIRALTY — LIBEL TO RECOVER LAY — DISPOSAL OF OIL — VIOLATION OF SHIPPING ARTICLES — PENALTY.

1. Where the master of a whaling vessel is also a co-owner, a libel in admiralty against the other owners to recover his lay, disbursements and commissions on sales of slops will be sustained as within the jurisdiction of the court so far as the lay is concerned, but not in respect to the other claims.

[Cited in The H. E. Willard, 52 Fed. 388, 53 Fed. 600.]

2. Owners are not allowed to charge the officers or crew commissions for selling the oil.

3. It is the duty of the owners to sell the oil for cash as soon as the same can reasonably be done. And the cash market price, and that only, is the measure of compensation for the officers and crew who are to be paid lays.

[Cited in Crowell v. Knight, Case No. 3,445.]

[1] [Reported by John Lathrop, Esq., and here reprinted by permission.]

4. The owners, on the ground of established usage to the contrary, have no right to deduct the value of the casks from the sales of the cargo.

5. General advances of money having been made by the owners to the libellant during the voyage and before its settlement, there being nothing to show whether such advances were made on account of libellant's interest as co-owner, or on account of his earnings as master, the respondents were allowed to appropriate the same in part payment of his lay.

6. Where a violation of that part of the shipping articles prohibiting the taking on board spirituous liquors, except for specified purpose, under pain of forfeiture of the entire snare of the voyage belonging to the offender, is proved, this court will not pronounce for an absolute forfeiture, but will inflict such a measure of penalty as the case equitably requires.

7. Proof of special damage occasioned by using spirituous liquors is not required.

8. In the present case the sum of $375 was deducted for such violation.

This was a libel in admiralty, originally brought against the other owners of a whaling bark by the libellant, who was himself one of the owners as well as master, to recover his lay, an alleged balance due on the disbursement account, and commissions on sale of slops. The respondent demurred to the jurisdiction of the court. The demurrer was sustained as to so much of the claim as related to disbursements and commissions, and overruled as to the matter of the lay. The case then proceeded to trial upon the issue of fact set up by the respondent in reference to the intoxication of the libellant, and his violation of the pledge in relation to taking liquors on board contained in the shipping articles.[1] The decision was reserved, and the case sent to an auditor to ascertain what the lay would amount to. Upon the coming in of the auditor's report, a hearing was had, and subsequently the following opinion was delivered.

J. C. Stone, for libellant.

R. C. Pitman, for respondent.

SPRAGUE, District Judge. Several questions have arisen on the auditor's report, and also upon the provision of the shipping articles in reference to spirituous liquors. I will first examine the former. The respondents claim commissions for selling and guaranteeing the oil, if they are to be charged with the credit price, or if that claim is not allowed, then that the credit price should be

reduced to the price at which the oil could have been sold for cash.

I have several times decided against the commissions. Years ago it was urged that it was usual. I decided against the claim as inconsistent with the contract itself. In one clause of the articles the seamen bind themselves to serve for the share of the proceeds set against their names. If this stood alone, the inference might be that they were joint owners of the product of the voyage; but another article says that the seamen shall receive payment for their shares as soon as the oil can be sold and the accounts made up. It is apparent that they are not intended to be owners or to have a share of oil, and it was long ago so decided, but they are to be paid. Then it is clear the owners are to have the property in the oil. It is the duty of the officers and seamen to bring the cargo home, and deliver it to the owners; then the owners are to sell it and make up the accounts; that they have engaged to do, and they have no more right to charge for their personal services in doing what they have promised to do, than the seamen would have to charge monthly wages. A practice to the contrary is in direct violation of the contract. It must have grown up from error or by reason of the character of the men dealt with; acquiesced in, because the individual amount was small, the crew in a hurry, and it was not an object for them to contest it. These charges must be disallowed.

Then as to price. In my view, the articles contemplate a cash sale. The oil is to be sold as soon as it can fairly be put into the market, and sold for cash. It was never contemplated that the seamen should wait four or six months, or that the owners should have the power of making them submit to their terms to obtain the ready money. The duty of the owner is clear, to sell for cash in a reasonable time and with reasonable efforts. If he has not done so, then the other party must be put in as good a condition as if he had. If, therefore, a sale is made on credit for a larger price, all the owner is responsible for is the price of a cash sale; he is not bound by the credit sale. That may come in as evidence, but it is not the rule. In this case, on the assessor's report, I must allow two cents a gallon, as the difference between the cash and credit price.

The next claim is, that the owners should be allowed the value of the casks. A strong argument is urged from the language of the articles: it is said, the crew are to be paid from the product of the voyage, and that therefore they have only a right to the proceeds of the oil and bone, and the price of the oil must be ascertained independently of the casks. On the other hand, we must consider that the articles are extremely abstinent in regard to the duties of the owners. If we look at these articles alone, no obligation will be found on their part to furnish casks at all. If this were the first whaling voyage,

---

[1] The clause referred to is as follows: "No distilled spirituous liquors will be put on board this vessel by the owner, except for strictly medicinal use; and by their signatures the other parties to this contract pledge themselves not to take any of these articles with them as their private stores, or for traffic, either from this port or any other port or place where they may be during the voyage. And in case of a violation of this pledge by the master, or any officer or seaman, his entire share of the voyage shall be thereupon forfeited to the use of the owners."

It would be a fair question whether the owners should or not furnish the casks. It might be claimed from the analogy of other fishing voyages that the crew were bound to contribute to furnish more or less of the outfits. But now an established usage determines this. The usage is well established, that the owners furnish the casks. Is it merely to bring home the oil, or is it also for the purpose of being sold with the oil? Have they not given credit for the whole proceeds, including the package? The auditor's report says, the practice is for the oil to go with the casks. No instance is shown where the casks were charged for. Now, then, where the obligations of owners are a matter of inference from usage, here is a long-established uniform usage, and established by the owners themselves. Why should they set it aside in this case? Could the seamen have understood that a different rule was to be applied in the settlement of this voyage? I think not. Standing on the established usage, I cannot allow the deduction of the value of the casks.

The next question is one of appropriation of payments. The respondents contend that the payments made to the libellant's wife during the voyage, and to the libellant on his return, should be applied to his lay. On the other hand, the libellant says the payments should be left to be applied to his account as part owner. The libellant's counsel say that these advances were not payments, as nothing was due when they were made. That is true; they are not, strictly speaking, payments, and the same may be said if you attempt to appropriate them to the account with him as owner. So both stand on equal ground here. What was the real understanding as to these advances? I do not suppose in such cases they are thought to be mere loans, creating a debt that may be sued at once, but an advance to come into the settlement of the voyage; and there is no claim for repayment till then, if at all, in case the voyage does not amount to so much. If the libellant was only master, no question would arise; but here he is also owner, and he says he has his choice to appropriate to that account. But there is great difficulty in this. It seems to me that when advances have been made the owner may say, I am to be repaid out of the first settlement. I have a right to deduct from either. That is most probably the understanding, and is what the owner might well have insisted on. In point of fact, the lay of the master, if settled separately, would be settled first, and the payments would generally be deducted from the lay. I see no reason why I should compel an owner to pay the whole of the master's lay, and turn him over to the chance of getting his pay in another settlement. One insurmountable obstacle is that a court of admiralty does not take cognizance of accounts of part-owners, unless incidentally. Now, if I took the libellant's view, it would be neces-

sary for me to go into those accounts to see if there is any thing due from which the respondents could deduct the advances. It may turn out as between the owners that nothing is due to libellant as one. I shall therefore deduct these payments from the lay.

The last question arises upon the use of spirituous liquors by the master, and his violation of the provisions of the shipping articles against taking them on board as his private stores.

First, as to the question of forfeiture. The articles prescribe a forfeiture of the wages for the whole voyage. But I shall treat this as forfeitures are generally treated,—they are to be cut down to a just amount under all the circumstances. I cannot suppose, indeed, that it was really intended that a total forfeiture should be made as prescribed. Some voyages are four or five years in length; then if any seaman should, after four years of faithful service, bring on board, when liberty was given on shore, a single bottle of liquor, he would, by the terms of this provision, forfeit his whole voyage. It cannot be supposed that such an injustice was intended by the owners. I have therefore no hesitation in saying that the court are not called on rigidly to inflict the whole of this forfeiture.

But then the inquiry arises, when this stipulation has been violated, as is proved here to be the case, what shall be the actual amount inflicted as a penalty? That is the most difficult question. I have no guide. Certainly, where the master, who has entered into this agreement himself, and whose duty it is to see that others observe it, violates it habitually, he has no claim for indulgence. The proof of the extent of his misconduct in this matter is somewhat conflicting, and less satisfactory than could be desired. (The judge here adverted to the evidence.) There is no testimony that any particular damage was done to this voyage, but no question that the master had liquor on board, and drank frequently. The damage is then left to inference. It might be inferred that he was less competent, that it disturbed his judgment, caused delay in port, recklessness in management, &c. These are all matters of inference, and it remains true that there are no specifications of injury. Then, also, the fact is to be considered, that this was a fair voyage or something more. I am left to say how much should be inflicted as a deduction. I suppose men of certain views might inflict the whole amount, while another class would say, nothing, without proof of special damage. I think there should be damages given without proof of special damage. I hold the contract to be an important one, and one that the owners have a right to make, and to see that it is enforced. If the master does not intend to abide by it, he should not go the voyage. It can never be ascertained with certainty, how much the

voyage is injured by its violation. The master's energy, activity, and fidelity are to be relied on above all others; therefore it is not a case for mere nominal damages. This is the first time I have been called on to inflict this penalty, and I have thought, on the whole, I should assess three hundred and seventy-five dollars ($375) as the damages. I hope this is as much as the damage to the owners amounts to, and I think it necessary to give as much as this as a serious admonition that this stipulation is to be observed. Decree accordingly.